# EXHIBIT A-1

//0v0



1

# 800 WILSHIRE BOULEVARD

2

# OFFICE LEASE

3
4

SWC 800 WILSHIRE, LLC,
a California limited liability company,

5

as Landlord,

6

and

7
8

800 WILSHIRE GROUP, LLC,
a California limited liability company,

9
10

as Tenant.

# TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| 2337 | ARTICLE 1 | REAL PROPERTY, BUILDING AND PREMISES | 1 |
| 2338 | ARTICLE 2 | LEASE TERM | 2 |
| 2339 | ARTICLE 3 | BASE RENT | 3 |
| 2340 | ARTICLE 4 | ADDITIONAL RENT | 4 |
| 2341 | ARTICLE 5 | USE OF PREMISES | 10 |
| 2342 | ARTICLE 6 | SERVICES AND UTILITIES | 11 |
| 2343 | ARTICLE 7 | REPAIRS | 13 |
| 2344 | ARTICLE 8 | ADDITIONS AND ALTERATIONS | 14 |
| 2345 | ARTICLE 9 | COVENANT AGAINST LIENS | 15 |
| 2346 | ARTICLE 10 | INSURANCE | 16 |
| 2347 | ARTICLE 11 | DAMAGE AND DESTRUCTION | 18 |
| 2348 | ARTICLE 12 | NON-WAIVER | 21 |
| 2349 | ARTICLE 13 | CONDEMNATION | 21 |
| 2350 | ARTICLE 14 | ASSIGNMENT AND SUBLETTING | 22 |
| 2351 | ARTICLE 15 | SURRENDER OF PREMISES; REMOVAL OF TRADE FIXTURES | 26 |
| 2352 | ARTICLE 16 | HOLDING OVER | 27 |
| 2353 | ARTICLE 17 | ESTOPPEL CERTIFICATES | 27 |
| 2354 | ARTICLE 18 | SUBORDINATION | 28 |
| 2355 | ARTICLE 19 | DEFAULTS; REMEDIES | 28 |
| 2356 | ARTICLE 20 | ATTORNEYS' FEES | 30 |
| 2357 | ARTICLE 21 | SECURITY DEPOSIT | 31 |
| 2358 | ARTICLE 22 | SUBSTITUTION OF PREMISES | 31 |
| 2359 | ARTICLE 23 | SIGNS | 32 |

i

## TABLE OF CONTENTS (Cont'd)

|  |  | Page |
|---|---|---|
| 2360 | ARTICLE 24  COMPLIANCE WITH LAW | 33 |
| 2361 | ARTICLE 25  LATE CHARGES | 33 |
| 2362 2363 | ARTICLE 26  LANDLORD'S RIGHT TO CURE DEFAULT; PAYMENTS BY TENANT | 34 |
| 2364 | ARTICLE 27  ENTRY BY LANDLORD | 34 |
| 2365 | ARTICLE 28  TENANT PARKING | 35 |
| 2366 2367 | ARTICLE 29  MISCELLANEOUS PROVISIONS | 35 |

2368 <u>EXHIBITS</u>
2369
2370 EXHIBIT A – OUTLINE OF PREMISES
2371 EXHIBIT B – RULES AND REGULATIONS
2372 EXHIBIT C – NOTICE OF LEASE TERM DATES
2373 EXHIBIT D – TENANT IMPROVEMENTS
2374 EXHIBIT E – FORM OF TENANT'S ESTOPPEL CERTIFICATE
2375

LOSA2\329548.2

# SUMMARY OF BASIC LEASE INFORMATION

The undersigned hereby agree to the following terms of this Summary of Basic Lease Information (the "**Summary**"). This Summary is hereby incorporated into and made a part of the attached Office Lease (this Summary and the Office Lease to be known collectively as the "**Lease**") which pertains to the office building described in Section 6.1 below (the "**Building**"). Each reference in the Office Lease to any term of this Summary shall have the meaning as set forth in this Summary for such term. In the event of a conflict between the terms of this Summary and the Office Lease, the terms of the Office Lease shall prevail. Any initially capitalized terms used herein and not otherwise defined herein shall have the meaning as set forth in the Office Lease.

| TERMS OF LEASE (References are to the Office Lease) | DESCRIPTION |
|---|---|
| 1. Dated as of: | September 10, 2007 |
| 2. Landlord: | SWC 800 WILSHIRE, LLC, a California limited liability company |
| 3. Address of Landlord (Section 29.14): | SWC 800 Wilshire, LLC c/o The Ratkovich Company 800 Wilshire Boulevard, Suite 1425 Los Angeles, California 90017 Attn: Ms. Clare De Briere |
| | With a copy to: |
| | The Prudential Insurance Company of America c/o Prudential Real Estate Investors 8 Campus Drive Arbor Circle South Parsippany, New Jersey 07054 Attn: Soultana Reigel |
| | And: |
| | The Prudential Insurance Company of America c/o Prudential Real Estate Investors 8 Campus Drive, 4th Floor Arbor Circle South Parsippany, New Jersey 07054 Attn: Joan Hayden, Corporate Counsel |
| 4. Tenant: | 800 WILSHIRE GROUP, LLC, a California limited liability company |

LOSA2\329548.2

5.  Address of Tenant (Section 29.14):  800 Wilshire Boulevard, Suite 640
                  Los Angeles, California 90017
                  Attention:  Mr. Gabriel Morales

6.  Premises (Article 1).

  6.1.  Building:        800 Wilshire Boulevard

  6.2.  Premises:       Approximately 1,783 rentable square feet of space located on the sixth (6th) floor, as set forth in Exhibit A attached hereto, and identified as Suite 640.

  6.3.  Number of rentable square feet in Building:              225,727.80

7.  Term (Article 2).

  7.1.  Lease Term:      Five (5) Years Two (2) Months

  7.2.  Lease Commencement Date:  See Section 2.2.

  7.3.  Lease Expiration Date:   The date which is the first day following the sixty-second (62nd) monthly anniversary of the Lease Commencement Date.

8.  Base Rent (Article 3):

| Lease Months | Annual Base Rent | Monthly Installment of Base Rent | Rental Rate per Rentable Square Foot per Annum |
|---|---|---|---|
| 1-14 | $49,924.00 | $4,160.33 | $28.00 |
| 15-26 | $51,421.68 | $4,285.14 | |
| 27-38 | $52,964.28 | $4,413.69 | |
| 39-50 | $54,553.20 | $4,546.10 | |
| 51-62 | $56,189.76 | $4,682.48 | |

21

9.  Additional Rent (Article 4).

  9.1.  Base Year:      The calendar year of 2007.

  9.2.  Tenant's Share of Direct Expenses:     Approximately 0.79%

LOSA2\329548.2

10. Security Deposit (<u>Article 21</u>):

$9,364.96 [*Subject to receipt and review of Tenant's financial information*]

11. Number of Parking Passes (<u>Article 28</u>):

Two (2) unreserved parking passes.

12. Brokers (<u>Section 29.19</u>):

Landlord's Broker:  CB Richard Ellis, Inc.

Tenant's Broker: None

13. Permitted Use (<u>Section 5</u>):

Professional offices in keeping with the character of a first-class office building.

22          The foregoing terms of this Summary are hereby agreed to by Landlord and Tenant.

23                    **LANDLORD:**

24          **SWC 800 WILSHIRE, LLC,**
25          a California limited liability company

26          By:    PRUDENTIAL 800 WILSHIRE GENERAL
27                    PARTNERSHIP,
28                    a California general partnership,
29                    Its Managing Member

30                    By:    PRUDENTIAL INVESTMENT
31                              MANAGEMENT, INC.,
32                              a New Jersey corporation,
33                              Its Authorized Manager

34                              By: _Sultana Resale_
35                              Name: _Sultana Resale_
36                              Title _Vice President_

37          **TENANT:**

38          **800 WILSHIRE GROUP, LLC,**
39          a California limited liability company

40          By: _____
41          Name: _Gabriel Morales_
42          Its: _managing partner_

iii

43

## OFFICE LEASE

44        This Office Lease, which includes the preceding Summary of Basic Lease Information
45  (the "**Summary**") attached hereto as pages (ii) through (iv) and incorporated herein by this
46  reference (the Office Lease and Summary to be known sometimes collectively hereafter as the
47  "**Lease**"), dated as of the date set forth in <u>Section 1</u> of the Summary, is made by and between
48  "**Landlord**" and "**Tenant**" as those terms are defined in <u>Sections 2 and 4</u> of the Summary,
49  respectively.

50                                        ARTICLE 1
51
52                    REAL PROPERTY, BUILDING AND PREMISES

53        1.1.  <u>Real Property, Building and Premises</u>.  Upon and subject to the terms set forth in
54  this Lease, Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the
55  premises set forth in <u>Section 6.2</u> of the Summary (the "**Premises**"), which Premises are located
56  in the building (the "**Building**") set forth in <u>Section 6.1</u> of the Summary, reserving, however, to
57  Landlord:  (i) the sole and exclusive right to consent to the use or occupancy of the Premises by
58  any person other than Tenant, whether by sublease, assignment or otherwise, and all right, title
59  and interest in the economic value of the leasehold estate in the Premises for the Lease Term, all
60  as more fully set forth in <u>Article 14</u> of this Lease, (ii) all of the Building, except for the space
61  within the inside surfaces bounding the Premises, and except as provided below in this <u>Article 1</u>,
62  and (iii) the rights, interests and estates reserved to Landlord by provisions of this Lease or
63  operation of law.  The outline of the Premises is set forth in <u>Exhibit A</u> attached hereto.  The
64  rentable square footages of the Premises and the Building are set forth in <u>Section 6</u> of the
65  Summary.  The Building, the parking structure servicing the Building, the land upon which the
66  Building stands, and the land, improvements and other buildings surrounding the Building which
67  are designated from time to time by Landlord as appurtenant to or servicing the Building, are
68  herein sometimes collectively referred to herein as the "**Real Property.**"  Tenant acknowledges
69  that Landlord has made no representation or warranty regarding the condition of the Real
70  Property except as specifically set forth in this Lease.  Tenant is hereby granted the right to the
71  nonexclusive use of the common corridors and hallways, stairwells, elevators, restrooms and
72  other public or common areas located on the Real Property; provided, however, that the manner
73  in which such public and common areas are maintained and operated shall be in a quality
74  comparable to buildings of a similar class located in the downtown Los Angeles, California area
75  (the "**Comparable Buildings**") and the use thereof shall be subject to the rules, regulations and
76  restrictions attached hereto as <u>Exhibit B</u> (the "**Rules and Regulations**").  Landlord reserves the
77  right to make alterations or additions to or to change the location of elements of the Real
78  Property and the common areas thereof.  Except when and where Tenant's right of access is
79  specifically excluded in this Lease, Tenant shall have the right of access to the Premises and
80  Building parking areas twenty-four (24) hours per day, seven (7) days per week during the
81  "**Lease Term,**" as that term is defined in <u>Section 2.1</u> of this Lease.

82        1.2.  <u>Verification of Rentable Square Feet of Premises and Building</u>.  For purposes of this
83  Lease, "**rentable square feet**" shall be calculated pursuant to Standard Method for Measuring
84  Floor Area in Office Buildings, ANSI Z65.1 - 1996 ("**BOMA**"), provided that the  rentable
85  square footage of the Building shall include all of, and the rentable square footage of the

LOSA2\329548.2

86   Premises therefore shall include a portion of, the square footage of the ground floor common
87   areas located within the Building and the common area and occupied space of the portion of the
88   Building or Real Property, dedicated to the service of the Building. The rentable square feet of
89   the Premises and the Building are subject to verification from time to time by Landlord's
90   planner/designer and such verification shall be made in accordance with the provisions of this
91   Article 1. Tenant may consult with Landlord's planner/designer regarding such verification,
92   except to the extent it relates to the rentable square feet of the Building; however, the
93   determination of Landlord's planner/designer shall be conclusive and binding upon the parties.
94   In the event that Landlord's planner/designer determines that the amounts thereof shall be
95   different from those set forth in this Lease, all amounts, percentages and figures appearing or
96   referred to in this Lease based upon such incorrect amount (including, without limitation, the
97   amount of the **"Rent"** and any **"Security Deposit,"** as those terms are defined in Article 4 and
98   Article 21 of this Lease, respectively) shall be modified in accordance with such determination.
99   If such determination is made, it will be confirmed in writing by Landlord to Tenant.

100                                              ARTICLE 2
101
102                                              LEASE TERM

103          2.1. Lease Term. The terms and provisions of this Lease shall be effective as of the date
104   of this Lease. The term of this Lease (the **"Lease Term"**) shall be as set forth in Section 7.1 of
105   the Summary and shall commence on the date (the **"Lease Commencement Date"**) set forth in
106   Section 7.2 of the Summary, and shall terminate on the date (the **"Lease Expiration Date"**) set
107   forth in Section 7.3 of the Summary, unless this Lease is sooner terminated as hereinafter
108   provided. For purposes of this Lease, the term **"Lease Year"** shall mean each consecutive
109   twelve (12) month period during the Lease Term. At any time during the Lease Term, Landlord
110   may deliver to Tenant a notice in the form as set forth in Exhibit C, attached hereto, which
111   Tenant shall execute and return to Landlord within five (5) days of receipt thereof.

112          2.2. Commencement Date. The Term of this Lease and Tenant's obligation to pay Rent,
113   as such term is defined below, shall commence on the earliest of: (a) the date that the Tenant
114   Improvements are substantially completed and the Premises are Ready for Occupancy; or (b) the
115   date the Tenant Improvements would have been substantially completed and the Premises would
116   have been Ready For Occupancy except for Tenant Delays; or (c) the date that Tenant, or any
117   person occupying any of the Premises with Tenant's permission, commences business operations
118   from the Premises (**"Commencement Date"**). The terms **"Tenant Improvements," "Ready for**
119   **Occupancy"** and **"Tenant Delays"** are defined in the Work Letter Agreement attached hereto as
120   Exhibit "D" and made a part hereof.

121          2.3. Delivery of Premises. The Premises will be delivered to Tenant when the Tenant
122   Improvements have been constructed and the Premises are Ready For Occupancy. Delay of the
123   Commencement Date to the extent not attributable to Tenant Delays shall be Tenant's sole
124   remedy for any delay in constructing the Tenant Improvements or making the Premises Ready
125   For Occupancy. Tenant understands that it is in Landlord's best economic interests to have the
126   Tenant Improvements completed as soon as reasonably possible in order to have the
127   Commencement Date occur as early as possible, and Tenant understands that to the extent that
128   the Tenant Improvements are not completed because of Tenant Delays, the Commencement Date

LOSA2\329548.2

129   will nevertheless occur on the date the Tenant Improvements would have been completed except
130   for Tenant Delays.

131        2.4. <u>Early Entry Into Premises</u>.  Tenant may enter into the Premises upon receipt of
132   Landlord's consent, for the purpose of installing furniture, special flooring or carpeting, trade
133   fixtures, telephones, computers, photocopy equipment, and other business equipment.  Such
134   early entry will not advance the Commencement Date, provided (a) Tenant does not commence
135   business operations from any part of the Premises, and (b) Tenant's early entry does not interfere
136   with, or delay, the completion of the Tenant Improvements.  If Tenant is allowed early entry,
137   Landlord shall not be responsible for, and Tenant is required to obtain insurance covering, any
138   loss, including theft, damage or destruction to any work or material installed or stored by Tenant
139   or Landlord, or any contractor or individual involved in the ˜completion of the Tenant
140   Improvements, or for any injury to Tenant or Tenant's employees, agents, contractors, licensees,
141   directors, officer, partners, trustees, visitors or invitees (collectively, **"Tenant Parties"**) or to any
142   other person.  Landlord shall have the right to post the appropriate notices of nonresponsibility
143   and to require Tenant to provide Landlord with evidence that Tenant has fulfilled its obligation
144   to provide insurance pursuant to this Lease.  To the extent any such early entry actually delays
145   the making of the Premises Ready for Occupancy, such delay, but only to the extent that such
146   early entry actually delays the completion of the Tenant Improvements, shall constitute a Tenant
147   Delay.

148        2.5. <u>Notice of Commencement Date</u>.  Landlord may send Tenant notice of the
149   occurrence of the Commencement Date in the form of the attached Exhibit "C", which notice
150   Tenant shall acknowledge by executing a copy of the notice and returning it to Landlord.  If
151   Tenant fails to sign and return the notice to Landlord within ten (10) days of receipt of the notice
152   from Landlord, the notice as sent by Landlord shall be deemed to have correctly set forth the
153   Commencement Date.  Failure of Landlord to send such notice shall have no effect on the
154   Commencement Date.

155                                      <u>ARTICLE 3</u>
156
157                                      <u>BASE RENT</u>

158        3.1. <u>Base Rent</u>.  Tenant shall pay, without notice or demand, to Landlord at the
159   management office of the Building, or at such other place as Landlord may from time to time
160   designate in writing, in the form of a check (which is drawn upon a bank which is located in the
161   State of California) or currency which, at the time of payment, is legal tender for private or
162   public debts in the United States of America, base rent ("**Base Rent**") as set forth in <u>Section 8</u> of
163   the Summary, payable in equal monthly installments as set forth in <u>Section 8</u> of the Summary in
164   advance on or before the first day of each and every calendar month during the Lease Term,
165   without any setoff or deduction whatsoever. The Base Rent for the first (1st) full calendar month
166   of the Lease Term, shall be paid at the time of Tenant's execution of this Lease.  If any "**Rent**",
167   as that term is defined in <u>Section 4.1</u>, below, payment date (including the Lease Commencement
168   Date) falls on a day of a calendar month other than the first day of such calendar month or if any
169   Rent payment is for a period which is shorter than one calendar month such as during the last
170   month of the Lease Term, the Rent for any fractional calendar month shall accrue on a daily
171   basis for the period from the date such payment is due to the end of such calendar month or to

172  the end of the Lease Term at a rate per day which is equal to 1/365 of the Rent.  All other
173  payments or adjustments required to be made under the terms of this Lease that require proration
174  on a time basis shall be prorated on the same basis.

175      3.2.  <u>Abatement of Base Rent</u>.  Provided Tenant shall faithfully perform all of the terms
176  and conditions of this Lease, Landlord shall abate Tenant's obligation to pay Base Rent for the
177  first two (2) months following the Commencement Date.  In the event of a default by Tenant
178  under the terms of this Lease which results in either the early termination of this Lease and/or
179  Tenant vacating and/or being evicted from the Premises, then as part of the recovery permitted
180  Landlord under this Lease, Landlord shall be entitled to a recovery of the Base Rent which was
181  abated under the provisions of this <u>Section 3.2</u>; i.e., such Base Rent shall not be deemed to have
182  been forgiven or abated, but shall become immediately due and payable as unpaid Rent which
183  had been earned at the date of default.

184                              ARTICLE 4
185
186                          ADDITIONAL RENT

187      4.1.  <u>Additional Rent</u>.  In addition to paying the Base Rent specified in <u>Article 3</u> of this
188  Lease, Tenant shall pay as additional rent **"Tenant's Share"** of the annual **"Direct Expenses,"**
189  as those terms are defined in <u>Sections 4.2.6 and 4.2.2</u> of this Lease, respectively, which are in
190  excess of the amount of Direct Expenses applicable to the **"Base Year,"** as that term is defined in
191  <u>Section 4.2.1</u> of this Lease.  Such additional rent, together with any and all other amounts
192  payable by Tenant to Landlord, as additional rent or otherwise, pursuant to the terms of this
193  Lease, shall be hereinafter collectively referred to as the **"Additional Rent."** The Base Rent and
194  Additional Rent are herein collectively referred to as the **"Rent."** All amounts due under this
195  <u>Article 4</u> as Additional Rent shall be payable for the same periods and in the same manner, time
196  and place as the Base Rent.  Without limitation on other obligations of Tenant which shall
197  survive the expiration of the Lease Term, the obligations of Tenant to pay the Additional Rent
198  provided for in this <u>Article 4</u> shall survive the expiration of the Lease Term.

199      4.2.  <u>Definitions</u>.  As used in this <u>Article 4</u>, the following terms shall have the meanings
200  hereinafter set forth:

201          4.2.1. **"Base Year"** shall mean the period set forth in <u>Section 9.1</u> of the
202  Summary.

203          4.2.2. **"Direct Expenses"** mean **"Operating Expenses"** and **"Tax Expenses,"** as
204  those terms are defined herein below.

205          4.2.3. **"Expense Year"** shall mean each calendar year in which any portion of the
206  Lease Term falls, through and including the calendar year in which the Lease Term expires.

207          4.2.4. **"Operating Expenses"** shall mean all expenses, costs and amounts of
208  every kind and nature which Landlord shall pay or incur during any Expense Year in accordance
209  with sound real estate management principles consistently applied because of or in connection
210  with the ownership, management, maintenance, repair, replacement, restoration or operation of
211  the Real Property, including, without limitation, any amounts paid or incurred for (i) the cost of

- 4 -

212     supplying all utilities, the cost of operating, maintaining, repairing, replacing, renovating and
213     managing the utility systems, mechanical systems, sanitary and storm drainage systems, and
214     escalator and elevator systems, and the cost of supplies, tools, and equipment and maintenance
215     and service contracts in connection therewith; (ii) the cost of licenses, certificates, permits and
216     inspections and the cost of contesting the validity or applicability of any governmental
217     enactments which may affect Operating Expenses, and the costs incurred in connection with the
218     implementation and operation of a transportation system management program or similar
219     program; (iii) the cost of earthquake insurance and other insurance carried by Landlord, in such
220     amounts as Landlord may reasonably determine; (iv) fees, charges and other costs, including
221     management fees (or amounts in lieu thereof), consulting fees (including, but not limited to, any
222     consulting fees incurred in connection with the procurement of insurance), legal fees and
223     accounting fees, of all persons engaged by Landlord or otherwise reasonably incurred by
224     Landlord in connection with the management, operation, maintenance and repair of the Real
225     Property; (v) the cost of parking area repair, restoration, and maintenance, including, but not
226     limited to, resurfacing, repainting, restriping, and cleaning; (vi) wages, salaries and other
227     compensation and benefits of all persons engaged in the operation, maintenance or security of
228     the Real Property, and employer's Social Security taxes, unemployment taxes or insurance, and
229     any other taxes which may be levied on such wages, salaries, compensation and benefits;
230     provided, that if any employees of Landlord provide services for more than one building of
231     Landlord, then a prorated portion of such employees' wages, benefits and taxes shall be included
232     in Operating Expenses based on the portion of their working time devoted to the Real Property,
233     and provided further, that no portion of any employee's wages, benefits, or taxes allocable to
234     time spent on the development or marketing of the Real Property shall be included in Operating
235     Expenses; (vii) payments under any easement, license, operating agreement, declaration,
236     restrictive covenant, or instrument pertaining to the sharing of costs by the Building; (viii)
237     amortization (including interest on the unamortized cost at a rate equal to the floating
238     commercial loan rate announced from time to time by Bank of America, a national banking
239     association, or its successor, as its prime rate, plus 2% per annum (the "**Interest Rate**") of the
240     cost of acquiring or the rental expense of personal property used in the maintenance, operation
241     and repair of the Building and Real Property; and (ix) the cost of capital improvements or other
242     costs incurred in connection with the Real Property (A) which relate to the operation, repair,
243     maintenance and replacement of all systems, equipment or facilities which serve the Real
244     Property in the whole or in part, (B) which are intended as a labor-saving device or to effect
245     other economies in the operation or maintenance of the Real Property, or any portion thereof to
246     the extent of cost savings reasonably anticipated by Landlord, or (C) that are required under any
247     governmental law or regulation that is then being enforced by a federal, state or local
248     governmental agency; provided, however, that each such permitted capital expenditure shall be
249     amortized (including interest on the unamortized cost) over its useful life as Landlord shall
250     reasonably determine. If the Building is not ninety-five percent (95%) occupied during all or a
251     portion of any Expense Year, Landlord shall make an appropriate adjustment to the variable
252     components of Operating Expenses for such Expense Year as reasonably determined by
253     Landlord employing sound accounting and management principles, to determine the amount of
254     Operating Expenses that would have been paid had the Building been one hundred percent
255     (100%) occupied, and the amount so determined shall be deemed to have been the amount of
    ⁀ r such Expense Year. Notwithstanding the foregoing, for purposes of this
    ⁀nses shall not, however, include (A) except as otherwise set forth above in

*100% gross up* [handwritten annotation]

258    this Section 4.2, bad-debt expenses, depreciation, interest and amortization on mortgages, or
259    ground lease payments, if any; (B) real estate brokers' leasing commissions; (C) the cost of
260    providing any service directly to and paid directly by any tenant; (D) any costs expressly
261    excluded from Operating Expenses elsewhere in this Lease; (E) costs of any items to the extent
262    Landlord receives reimbursement from insurance proceeds (such proceeds to be excluded from
263    Operating Expenses in the year in which received, except that any deductible amount under any
264    insurance policy shall be included within Operating Expenses) or from a third party; (F) costs of
265    capital improvements, except those set forth in this Section 4.2, or those includable in Operating
266    Expenses pursuant to an application by Landlord of sound real estate management principles;
267    (G) marketing costs, including leasing commissions, attorneys' fees in connection with the
268    negotiation and preparation of letters, deal memos, letters of intent, leases, subleases and/or
269    assignments, space planning costs, and other costs and expenses incurred in connection with
270    lease, sublease and/or assignment negotiations and transactions with present or prospective
271    tenants or other occupants of the Building, including attorneys' fees and other costs and
272    expenditures incurred in connection with disputes with present or prospective tenants or other
273    occupants of the Building; (H) costs, including permit, license and inspection costs, incurred
274    with respect to the installation of other tenants' occupants' improvements made for tenants or
275    other occupants in the Building or incurred in renovating or otherwise improving, decorating,
276    painting or redecorating vacant space for tenants or other occupants in the Building; (I) rentals
277    and other related expenses for leasing a heating, ventilation and air conditioning system,
278    elevators, or other items (except when needed in connection with normal repairs and
279    maintenance of the Building) which if purchased, rather than rented, would constitute a capital
280    improvement not included in Operating Expenses pursuant to this Lease; (J) depreciation,
281    amortization and interest payments, except as specifically included in Operating Expenses
282    pursuant to the terms of this Lease and except on materials, tools, supplies and vendor-type
283    equipment purchased by Landlord to enable Landlord to supply services Landlord might
284    otherwise contract for with a third party, where such depreciation, amortization and interest
285    payments would otherwise have been included in the charge for such third party's services, all as
286    determined in accordance with generally accepted accounting principles, consistently applied,
287    and when depreciation or amortization is permitted or required, the item shall be amortized over
288    its reasonably anticipated useful life; (K) costs incurred by Landlord for alterations (including
289    structural additions), repairs, equipment and tools which are of a capital nature and/or which are
290    considered capital improvements or replacements under generally accepted accounting
291    principles, consistently applied, except as specifically included in Operating Expenses pursuant
292    to the terms of this Lease; (L) expenses in connection with services or other benefits which are
293    not offered to Tenant or for which Tenant is charged for directly but which are provided to
294    another tenant or occupant of the Building, without charge; (M) overhead and profit increment
295    paid to Landlord or to subsidiaries or affiliates of Landlord for goods and/or services in the
296    Building to the extent the same exceeds the costs of such by unaffiliated third parties on a
297    competitive basis; (N) Landlord's general corporate overhead and general and administrative
298    expenses; (O) advertising and promotional expenditures, and costs of signs in or on the Building
299    identifying the owner of the Building or other tenants' signs; (P) electric power costs or other
300    utility costs for which any tenant directly contracts with the local public service company (but
301    Landlord shall have the right to "gross up" as if the floor was vacant); (Q) tax penalties incurred
302    as a result of Landlord's negligence, inability or unwillingness to make payments or file returns
303    when due; and (R) costs arising from Landlord's charitable or political contributions.

304         4.2.5. "**Tax Expenses**" shall mean all federal, state, county, or local
305 governmental or municipal taxes, fees, charges or other impositions of every kind and nature,
306 whether general, special, ordinary or extraordinary (including, without limitation, real estate
307 taxes, general and special assessments, transit taxes, leasehold taxes or taxes based upon the
308 receipt of rent, including gross receipts or sales taxes applicable to the receipt of rent, unless
309 required to be paid by Tenant, personal property taxes imposed upon the fixtures, machinery,
310 equipment, apparatus, systems and equipment, appurtenances, furniture and other personal
311 property used in connection with the Building), which Landlord shall pay or incur during any
312 Expense Year (without regard to any different fiscal year used by such governmental or
313 municipal authority) because of or in connection with the ownership, leasing and operation of the
314 Real Property. For purposes of this Lease, Tax Expenses shall be calculated as if the tenant
315 improvements in the Building were fully constructed and the Real Property, the Building, and all
316 tenant improvements in the Building were fully assessed for real estate tax purposes, and
317 accordingly, during the portion of any Expense Year occurring during the Base Year, Tax
318 Expenses shall be deemed to be increased appropriately.

319         4.2.5.1. Tax Expenses shall include, without limitation:

320         (i)    Any assessment, tax, fee, levy or charge in addition to, or in
321 substitution, partially or totally, of any assessment, tax, fee, levy or charge previously
322 included within the definition of real property tax, it being acknowledged by Tenant and
323 Landlord that Proposition 13 was adopted by the voters of the State of California in the
324 June 1978 election ("**Proposition 13**") and that assessments, taxes, fees, levies and
325 charges may be imposed by governmental agencies for such services as fire protection,
326 street, sidewalk and road maintenance, conservation, refuse removal and for other
327 governmental services formerly provided without charge to property owners or
328 occupants, and, in further recognition of the decrease in the level and quality of
329 governmental services and amenities as a result of Proposition 13, Tax Expenses shall
330 also include any governmental or private assessments or the Building's contribution
331 towards a governmental or private cost-sharing agreement for the purpose of augmenting
332 or improving the quality of services and amenities normally provided by governmental
333 agencies. It is the intention of Tenant and Landlord that all such new and increased
334 assessments, taxes, fees, levies, and charges and all similar assessments, taxes, fees,
335 levies and charges be included within the definition of Tax Expenses for purposes of this
336 Lease;

337         (ii)    Any assessment, tax, fee, levy, or charge allocable to or measured
338 by the area of the Premises or the rent payable hereunder, including, without limitation,
339 any gross income tax with respect to the receipt of such rent, or upon or with respect to
340 the possession, leasing, operating, management, maintenance, alteration, repair, use or
341 occupancy by Tenant of the Premises, or any portion thereof;

342         (iii)    Any assessment, tax, fee, levy or charge, upon this transaction or
343 any document to which Tenant is a party, creating or transferring an interest or an estate
344 in the Premises; and

345         (iv)    Any possessory taxes charged or levied in lieu of real estate taxes.

346           4.2.5.2. Any expenses incurred by Landlord in attempting to protest,
347 reduce or minimize Tax Expenses shall be included in Tax Expenses in the Expense Year such
348 expenses are paid. Tax refunds shall be deducted from Tax Expenses in the Expense Year they
349 are received by Landlord. All special assessments which may be paid in installments shall be
350 paid by Landlord in the maximum number of installments permitted by law and not included in
351 Operating Expenses except in the year in which the assessment is actually paid; provided,
352 however, that if the prevailing practice Comparable Buildings is to pay such assessments on a
353 yearly basis, and Landlord pays the same on such basis, such assessments shall be included in
354 Operating Expenses in the year paid by Landlord. In the event Tax Expenses for the Base Year
355 are retroactively reduced due to a reassessment occurring after the expiration of the Base Year,
356 the Tax Expenses component of the Base Year shall be proportionately reduced commencing
357 with the then-current Expense Year.

358           4.2.5.3. Notwithstanding anything to the contrary contained in this
359 Section 4.2.5 (except as set forth in Section 4.2.5.1 or levied in whole or part in lieu of Tax
360 Expenses), there shall be excluded from Tax Expenses (i) all excess profits taxes, franchise
361 taxes, gift taxes, capital stock taxes, inheritance and succession taxes, estate taxes, federal and
362 state income taxes, and other taxes to the extent applicable to Landlord's general or net income
363 (as opposed to rents, receipts or income attributable to operations at the Building), (ii) any items
364 included as Operating Expenses, and (iii) any items paid by Tenant under Section 4.5 of this
365 Lease.

366           4.2.6. "**Tenant's Share**" shall mean the percentage set forth in Section 9.2 of the
367 Summary. Tenant's Share was calculated by multiplying the number of rentable square feet of
368 the Premises by 100 and dividing the product by the total rentable square feet in the Building. In
369 the event either the Premises and/or the Building is expanded or reduced, Tenant's Share shall be
370 appropriately adjusted, and, as to the Expense Year in which such change occurs, Tenant's Share
371 for such year shall be determined on the basis of the number of days during such Expense Year
372 that each such Tenant's Share was in effect.

373        4.3. Calculation and Payment of Additional Rent.

374           4.3.1. Calculation of Excess. If for any Expense Year ending or commencing
375 within the Lease Term, Tenant's Share of Direct Expenses for such Expense Year exceeds
376 Tenant's share of the amount of Direct Expenses applicable to the Base Year, then Tenant shall
377 pay to Landlord, in the manner set forth in Section 4.3.2, below, and as Additional Rent, an
378 amount equal to the excess (the "**Excess**").

379           4.3.2. Statement of Actual Direct Expenses and Payment by Tenant. Landlord
380 shall endeavor to give to Tenant, on or before the first day of April following the end of each
381 Expense Year, a statement (the "**Statement**") which shall state the Direct Expenses incurred or
382 accrued for such preceding Expense Year, and which shall indicate the amount, if any, of any
383 Excess. Upon receipt of the Statement for each Expense Year ending during the Lease Term, if
384 an Excess is present, Tenant shall pay, with its next installment of Base Rent due, the full amount
385 of the Excess for such Expense Year, less the amounts, if any, paid during such Expense Year as
386 "**Estimated Excess**," as that term is defined in Section 4.3.3, below. The failure of Landlord to
387 timely furnish the Statement for any Expense Year shall not prejudice Landlord from enforcing

LOSA2\329548.2

388  its rights under this Article 4. Even though the Lease Term has expired and Tenant has vacated
389  the Premises, when the final determination is made of Tenant's Share of the Direct Expenses for
390  the Expense Year in which this Lease terminates, taking into consideration that the Lease
391  Expiration Date may have occurred prior to the final day of the applicable Expense Year, if an
392  Excess is present, Tenant shall immediately pay to Landlord an amount as calculated pursuant to
393  the provisions of Section 4.3.1 of this Lease. The provisions of this Section 4.3.2 shall survive
394  the expiration or earlier termination of the Lease Term.

395        4.3.3. Statement of Estimated Direct Expenses. In addition, Landlord shall give
396  Tenant a yearly expense estimate statement (the "**Estimate Statement**") which shall set forth
397  Landlord's reasonable estimate (the "**Estimate**") of what the total amount of Direct Expenses for
398  the then-current Expense Year shall be and the estimated excess (the "**Estimated Excess**") as
399  calculated by comparing Direct Expenses, which shall be based upon the Estimate, to the amount
400  of Direct Expenses applicable to the Base Year, which Estimate Statement may be revised and
401  reissued by Landlord from time to time. The failure of Landlord to timely furnish the Estimate
402  Statement for any Expense Year shall not preclude Landlord from enforcing its rights to collect
403  any Estimated Excess under this Article 4. If pursuant to the Estimate Statement (or a revision
404  thereof) an Estimated Excess is calculated for the then-current Expense Year, Tenant shall pay,
405  with its next installment of Base Rent due, a fraction of the Estimated Excess (or the increase in
406  the Estimated Excess if pursuant to a revised Estimated Statement) for the then-current Expense
407  Year (reduced by any amounts paid pursuant to the last sentence of this Section 4.3.3). Such
408  fraction shall have as its numerator the number of months which have elapsed in such current
409  Expense Year to the month of such payment, both months inclusive, and shall have twelve (12)
410  as its denominator. Until a new Estimate Statement is furnished, Tenant shall pay monthly, with
411  the monthly Base Rent installments, an amount equal to one-twelfth (1/12) of the total Estimated
412  Excess set forth in the previous Estimate Statement delivered by Landlord to Tenant.

413        4.4. Allocation of Direct Expenses. Notwithstanding anything to the contrary set forth in
414  this Article 4, when calculating the Direct Expenses for the Base Year, such Direct Expenses
415  shall not include any increase in Tax Expenses attributable to special assessments, charges, costs,
416  or fees, or due to modifications or changes in governmental laws or regulations, including, but
417  not limited to, the institution of a split tax roll, and Operating Expenses shall exclude market-
418  wide labor-rate increases due to extraordinary circumstances, including, but not limited to,
419  boycotts and strikes, and utility rate increases due to extraordinary circumstances including, but
420  not limited to, conservation surcharges, boycotts, embargoes or other shortages and amortized
421  costs relating to capital improvements.

422        4.5. Taxes and Other Charges For Which Tenant Is Directly Responsible. Tenant shall
423  reimburse Landlord, as Additional Rent, upon demand for any and all taxes required to be paid
424  by Landlord (except to the extent included in Tax Expenses by Landlord), excluding state, local
425  and federal personal or corporate income taxes measured by the net income of Landlord from all
426  sources and estate and inheritance taxes, whether or not now customary or within the
427  contemplation of the parties hereto, when:

428        4.5.1. Said taxes are measured by or reasonably attributable to the cost or value
429  of Tenant's equipment, furniture, fixtures and other personal property located in the Premises, or
430  by the cost or value of any leasehold improvements made in or to the Premises by or for Tenant,

431  to the extent the cost or value of such leasehold improvements exceeds the cost or value of a
432  building standard build-out as determined by Landlord regardless of whether title to such
433  improvements shall be vested in Tenant or Landlord;

434      4.5.2. Said taxes are assessed upon or with respect to the possession, leasing,
435  operation, management, maintenance, alteration, repair, use or occupancy by Tenant of the
436  Premises, any portion of the Real Property or the parking facility used by Tenant in connection
437  with this Lease; or

438      4.5.3. Said taxes are assessed upon this transaction or any document to which
439  Tenant is a party creating or transferring an interest or an estate in the Premises.

440      4.6.  Landlord's Books and Records.  Within ninety (90) days after receipt of a Statement
441  by Tenant, if Tenant disputes the amount of Additional Rent set forth in the Statement, a
442  reputable certified public accountant (which accountant is a member of a reputable independent
443  nationally or regionally recognized accounting firm and has had previous experience in
444  reviewing financial operating records of landlords of office buildings; provided that such
445  accountant is not retained by Tenant on a contingency fee basis), designated and paid for by
446  Tenant, may, after reasonable notice to Landlord and at reasonable times, inspect Landlord's
447  records at Landlord's offices, provided that Tenant is not then in default under this Lease.  In
448  connection with such inspection, Tenant and Tenant's agents must agree in advance to abide by
449  Landlord's reasonable rules and procedures regarding inspections of Landlord's records, and
450  shall execute a commercially reasonable confidentiality agreement regarding such inspection.
451  Tenant's failure to dispute the amount of Additional Rent set forth in any Statement within
452  ninety (90) days of Tenant's receipt of such Statement shall be deemed to be Tenant's approval
453  of such Statement and Tenant, thereafter, waives the right or ability to dispute the amounts set
454  forth in such Statement.  If after such inspection, Tenant still disputes such Additional Rent, a
455  certification as to the proper amount shall be made, at Tenant's expense, by an independent
456  certified public accountant (the "**Accountant**") selected by Landlord and subject to Tenant's
457  reasonable approval; provided that if such certification by the Accountant proves that Direct
458  Expenses were overstated by more than five percent (5%), then the cost of the Accountant and
459  the cost of such certification shall be paid for by Landlord.  Landlord shall be required to
460  maintain detailed records of all Direct Expenses set forth in each Statement delivered to Tenant
461  for two (2) years following Landlord's delivery of the applicable Statement.  In no event shall
462  this Section 4.6 be deemed to allow any review of any Landlord's records by any subtenant of
463  Tenant (approved by Landlord).  Tenant agrees that this Section 4.6 shall be the sole method to
464  be used by Tenant to dispute the amount of any Direct Expenses payable or not payable by
465  Tenant pursuant to the terms of this Lease, and Tenant hereby waives any other rights at law or
466  in equity relating thereto.

467  ARTICLE 5
468
469  USE OF PREMISES

470      Tenant shall use the Premises solely for the "**Permitted Use**," as that term is defined in
471  Section 13 of the Summary, and Tenant shall not use or permit the Premises to be used for any
472  other purpose or purposes whatsoever without the prior written consent of Landlord, which may

- 10 -

473  be withheld in Landlord's sole discretion, and shall not allow occupancy density of use of the
474  Premises which is greater than the approximate average density of the other tenants of the
475  Building.  Tenant further covenants and agrees that it shall not use, or suffer or permit any
476  person or persons to use, the Premises or any part thereof for any use or purpose contrary to the
477  Rules and Regulations, or in violation of the laws of the United States of America, the State of
478  California, or the ordinances, regulations or requirements of the local municipal or county
479  governing body or other lawful authorities having jurisdiction over the Building.  Tenant shall
480  faithfully observe and comply with the Rules and Regulations.  Landlord shall not be responsible
481  to Tenant for the nonperformance of any of such Rules and Regulations by or otherwise with
482  respect to the acts or omissions of any other tenants or occupants of the Building.  Tenant shall
483  comply with all recorded covenants, conditions, and restrictions now or hereafter affecting the
484  Real Property.  Tenant shall not use or allow another person or entity to use any part of the
485  Premises for the storage, use, treatment, manufacture or sale of hazardous materials or
486  substances as defined pursuant to any applicable federal, state or local governmental or quasi-
487  governmental law, code, ordinance, rule, or regulation.  Landlord acknowledges, however, that
488  Tenant will maintain products in the Premises which are incidental to the operation of its offices,
489  such as photocopy supplies, secretarial supplies and limited janitorial supplies, which contain
490  chemicals which are categorized as hazardous materials.  Landlord agrees that the use of such
491  products in the Premises in compliance with all applicable laws and in the manner in which such
492  products are designed to be used shall not be a violation by Tenant of this Article 5.

493                                      ARTICLE 6
494
495                              SERVICES AND UTILITIES

496      6.1.  Standard Tenant Services.  Landlord shall provide the following services on all days
497  during the Lease Term, unless otherwise stated below.

498           6.1.1.  Subject to all governmental rules, regulations and guidelines applicable
499  thereto, Landlord shall provide heating and air conditioning when necessary for normal comfort
500  for normal office use in the Premises, from Monday through Friday, during the period from 8:00
501  a.m. to 6:00 p.m., and on Saturdays during the period from 9:00 a.m. to 1:00 p.m., except for
502  Sundays and New Year's Day, President's Day, Memorial Day, Independence Day, Labor Day,
503  Thanksgiving Day, the day after Thanksgiving, Christmas Day and any other nationally and
504  locally recognized holidays (collectively, the "**Holidays**").

505           6.1.2.  Landlord shall provide twenty-four (24) hours per day, everyday, adequate
506  electrical wiring, facilities and power for normal general office use as determined by Landlord;
507  provided, however, that electrical usage, to the extent the same exceeds four (4) watts connected
508  load per usable square foot of the Premises per hour during Building standard business hours,
509  shall be deemed excess consumption and shall be subject to the terms of Section 6.2, below.
510  Tenant shall bear the cost of replacement of non-Building standard lamps, starters and ballasts
511  for lighting fixtures within the Premises.

512           6.1.3.  Landlord shall provide city water from the regular Building outlets for
513  drinking, lavatory and toilet purposes.

LOSA2\329548.2

514          6.1.4.  Landlord shall provide janitorial services Monday through Friday except
515    the date of observation of the Holidays, in and about the Premises.

516          6.1.5.  Landlord shall provide nonexclusive automatic elevator service at all
517    times.

518          6.2.  <u>Overstandard Tenant Use</u>.    Tenant shall not, without Landlord's prior written
519    consent, use heat-generating machines, machines other than normal fractional horsepower office
520    machines, or equipment or lighting other than building standard lights in the Premises, which
521    may affect the temperature otherwise maintained by the air conditioning system or increase the
522    water normally furnished for the Premises by Landlord pursuant to the terms of <u>Section 6.1</u> of
523    this Lease.  If such consent is given, Landlord shall have the right to install supplementary air
524    conditioning units or other facilities in the Premises, including supplementary or additional
525    metering devices, and the cost thereof, including the cost of installation, operation and
526    maintenance, increased wear and tear on existing equipment and other similar charges, shall be
527    paid by Tenant to Landlord upon billing by Landlord.  If Tenant uses water, electricity, heat or
528    air conditioning in excess of that supplied by Landlord pursuant to <u>Section 6.1</u> of this Lease,
529    Tenant shall pay to Landlord, upon billing, the cost of such excess consumption, the cost of the
530    installation, operation, and maintenance of equipment which is installed in order to supply such
531    excess consumption, and the cost of the increased wear and tear on existing equipment caused by
532    such excess consumption; and Landlord may install devices to separately meter any increased
533    use and in such event Tenant shall pay the increased cost directly to Landlord, on demand,
534    including the cost of such additional metering devices.  If Tenant desires to use heat, ventilation
535    or air conditioning during hours other than those for which Landlord is obligated to supply such
536    utilities pursuant to the terms of <u>Section 6.1</u> of this Lease, Tenant shall give Landlord such prior
537    notice, as Landlord shall from time to time establish as appropriate, of Tenant's desired use and
538    Landlord shall supply such utilities to Tenant at such hourly cost to Tenant as Landlord shall
539    from time to time establish.  As of the date hereof, the rate for after-hours HVAC is fifty-five
540    dollars ($55.00) per hour; provided, however, that Landlord may change such rate upon
541    notification to Tenant.  Amounts payable by Tenant to Landlord for such use of additional
542    utilities shall be deemed Additional Rent hereunder and shall be billed on a monthly basis.

543          6.3.  <u>Interruption of Use</u>.  Tenant agrees that Landlord shall not be liable for damages, by
544    abatement of Rent or otherwise, for failure to furnish or delay in furnishing any service
545    (including telephone and telecommunication services), or for any diminution in the quality or
546    quantity thereof, when such failure or delay or diminution is occasioned, in whole or in part, by
547    repairs, replacements, or improvements, by any strike, lockout or other labor trouble, by inability
548    to secure electricity, gas, water, or other fuel at the Building after using its commercially
549    reasonable efforts to do so, by any accident or casualty whatsoever, by act or default of Tenant or
550    other parties, or by any other cause beyond Landlord's reasonable control; and such failures or
551    delays or diminution shall never be deemed to constitute an eviction or disturbance of Tenant's
552    use and possession of the Premises or relieve Tenant from paying Rent or performing any of its
553    obligations under this Lease.  Furthermore, Landlord shall not be liable under any circumstances
554    for a loss of, or injury to, property or for injury to, or interference with, Tenant's business,
555    including, without limitation, loss of profits, however occurring, through or in connection with or
556    incidental to a failure to furnish any of the services or utilities as set forth in this <u>Article 6</u>,
557    provided that Landlord has used its commercially reasonable efforts to have such services or

- 12 -

558  utilities furnished. Landlord may comply with voluntary Controls or guidelines promulgated by
559  any governmental entity relating to the use or conservation of energy, water, gas, light or
560  electricity or the reduction of automobile or other emissions without creating any liability of
561  Landlord to Tenant under this Lease, provided that the Premises are not thereby rendered
562  untenantable.

563      6.4. Access. So long as Tenant complies with any security rules and regulations that
564  Landlord may reasonably deem necessary for the safety of the Building or the Premises, Tenant
565  shall have access to the Building and the Premises 24 hours per day, 7 days per week. Such
566  access shall be further subject to full or partial closures which may be required from time to time
567  for construction, maintenance, repairs, actual or threatened emergency or other events or
568  circumstances which make it reasonably necessary to temporarily restrict or limit access.

569                                    ARTICLE 7
570
571                                    REPAIRS

572      Landlord shall repair and maintain the structural portions of the Building, including
573  windows, basic plumbing, sewer, heating, ventilating, air-conditioning, fire suppression/
574  sprinkler, Building security and electrical systems installed or furnished by Landlord and not
575  located within the Premises, unless such maintenance and repairs are caused in part or in whole
576  by the act, neglect, fault or omission of any duty by Tenant or the Tenant Parties, in which event
577  Tenant shall pay to Landlord, as Additional Rent, the reasonable cost of such maintenance and
578  repairs. Tenant shall, at Tenant's own expense, pursuant to the terms of this Lease, including,
579  without limitation, Article 8 hereof, keep the Premises, including all improvements, fixtures and
580  furnishings therein, in good order, repair and condition at all times during the Lease Term. In
581  addition, Tenant shall, at Tenant's own expense but under the supervision and subject to the prior
582  approval of Landlord, and within any reasonable period of time specified by Landlord, pursuant
583  to the terms of this Lease, including, without limitation, Article 8 hereof, promptly and
584  adequately repair all damage to the Premises and replace or repair all damaged or broken fixtures
585  and appurtenances; provided, however, that, at Landlord's option, or if Tenant fails to make such
586  repairs, Landlord may, but need not, make such repairs and replacements, and Tenant shall pay
587  Landlord the cost thereof, including a percentage of the cost thereof (to be uniformly established
588  for the Building) sufficient to reimburse Landlord for all overhead, general conditions, fees and
589  other costs or expenses arising from Landlord's involvement with such repairs and replacements
590  forthwith upon being billed for same. Landlord may, but shall not be required to, enter the
591  Premises at all reasonable times to make such repairs, alterations, improvements and additions to
592  the Premises or to the Building or to any equipment located in the Building as Landlord shall
593  desire or deem necessary or as Landlord may be required to do by governmental or quasi-
594  governmental authority or court order or decree. Tenant hereby waives and releases its right to
595  make repairs at Landlord's expense under Sections 1941 and 1962 of the California Civil Code
596  or under any similar law, statute, or ordinance now or hereafter in effect.

597                                        ARTICLE 8
598
599                        ADDITIONS AND ALTERATIONS

600        8.1. <u>Landlord's Consent to Alterations</u>.    Tenant may not make any improvements,
601    alterations, additions or changes to the Premises (collectively, the **"Alterations"**) without first
602    procuring the prior written consent of Landlord to such Alterations, which consent shall be
603    requested by Tenant not less than thirty (30) days prior to the commencement thereof, and which
604    consent shall not be unreasonably withheld by Landlord.    The construction of the **"Initial**
605    **Improvements"** shall be governed by the terms of Exhibit "D".

606        8.2. <u>Manner of Construction</u>.    Landlord may impose, as a condition of its consent to all
607    Alterations or repairs of the Premises or about the Premises, such requirements as Landlord in its
608    sole discretion may deem desirable, including, but not limited to, the requirement that upon
609    Landlord's request, Tenant shall, at Tenant's expense, remove such Alterations upon the
610    expiration or any early termination of the Lease Term, and/or the requirement that Tenant utilize
611    for such purposes only contractors, materials, mechanics and materialmen selected by Landlord.
612    Tenant shall construct such Alterations and perform such repairs in conformance with any and all
613    applicable rules and regulations of any federal, state, county or municipal code or ordinance and
614    pursuant to a valid building permit, issued by the City of Los Angeles, in conformance with
615    Landlord's construction rules and regulations.    All work with respect to any Alterations must be
616    done in a good and workmanlike manner and diligently prosecuted to completion to the end that
617    the Premises shall at all times be a complete unit except during the period of work.    In
618    performing the work of any such Alterations, Tenant shall have the work performed in such
619    manner as not to obstruct access to the Building or the common areas for any other tenant of the
620    Building, and as not to obstruct the business of Landlord or other tenants in the Building, or
621    interfere with the labor force working in the Building.    In the event Tenant performs any
622    Alterations in the Premises which require or give rise to governmentally required changes to the
623    **"Base Building,"** as that term is defined below, then Landlord shall, at Tenant's expense, make
624    such changes to the Base Building.    The **"Base Building"** shall include the structural portions of
625    the Building, and the public restrooms and the systems and equipment located in the internal core
626    of the Building on the floor or floors on which the Premises are located.    Upon completion of
627    any Alterations and to the extent applicable, Tenant agrees to cause a timely Notice of
628    Completion to be recorded in the office of the Recorder of the County of Los Angeles in
629    accordance with the terms of <u>Section 3093</u> of the Civil Code of the State of California or any
630    successor statute, and Tenant shall deliver to the Building management office a reproducible
631    copy of the "as built" drawings of the Alterations.

632        8.3. <u>Payment for Improvements</u>.    In the event Tenant orders any Alterations or repair
633    work directly from Landlord or from a contractor selected by Landlord, the charges for such
634    work shall be deemed Additional Rent under this Lease, payable upon billing therefor, either
635    periodically during construction or upon the substantial completion of such work, at Landlord's
636    option.    Upon completion of any work not ordered directly from Landlord, Tenant shall deliver
637    to Landlord evidence of payment, contractors' affidavits and full and final waivers of all liens for
638    labor, services or materials.    In addition, in the event Tenant orders any Alterations or repair
639    work directly from Landlord or from a contractor selected by Landlord, Tenant shall pay to
640    Landlord an amount equal to fifteen percent (15%) of the cost of any such work to compensate

                                            - 14 -

641  Landlord for all overhead, general conditions, fees and other costs and expenses arising from
642  Landlord's involvement with such work.

643      8.4. <u>Construction Insurance</u>. In the event that Tenant makes any Alterations, Tenant
644  agrees to carry "**Builder's All Risk**" insurance in an amount approved by Landlord covering the
645  construction of such Alterations, and such other insurance as Landlord may require, it being
646  understood and agreed that all of such Alterations shall be insured by Tenant pursuant to <u>Article</u>
647  <u>10</u> of this Lease immediately upon completion thereof.  In addition, Landlord may, in its
648  reasonable discretion, require Tenant to obtain a lien and completion bond or some alternate
649  form of security satisfactory to Landlord in an amount sufficient to ensure the lien-free
650  completion of such Alterations and naming Landlord as a co-obligee.

651      8.5. <u>Landlord's Property</u>.  All Alterations, improvements, fixtures and/or equipment
652  which may be installed or placed in or about the Premises, and all signs installed in, on or about
653  the Premises, from time to time, shall be at the sole cost of Tenant and shall be and become the
654  property of Landlord, except that Tenant may remove any Alterations, improvements, fixtures
655  and/or equipment which Tenant can substantiate to Landlord have not been paid for with any
656  tenant improvement allowance funds provided to Tenant by Landlord, provided Tenant repairs
657  any damage to the Premises and Building caused by such removal. Furthermore, if Landlord, as
658  a condition to Landlord's consent to any Alteration, requires that Tenant remove any Alteration
659  upon the expiration or early termination of the Lease Term, Landlord may, by written notice to
660  Tenant prior to the end of the Lease Term, or given upon any earlier termination of this Lease,
661  require Tenant at Tenant's expense to remove such Alterations and to repair any damage to the
662  Premises and Building caused by such removal. If Tenant fails to complete such removal and/or
663  to repair any damage caused by the removal of any Alterations, Landlord may do so and may
664  charge the cost thereof to Tenant.

665                          ARTICLE 9
666
667                  COVENANT AGAINST LIENS

668      Tenant has no authority or power to cause or permit any lien or encumbrance of any kind
669  whatsoever, whether created by act of Tenant, operation of law or otherwise, to attach to or be
670  placed upon the Real Property, Building or Premises, and any and all liens and encumbrances
671  created by Tenant shall attach to Tenant's interest only.  Landlord shall have the right at all times
672  to post and keep posted on the Premises any notice which it deems necessary for protection from
673  such liens.  Tenant covenants and agrees not to suffer or permit any lien of mechanics or
674  materialmen or others to be placed against the Real Property, the Building or the Premises with
675  respect to work or services claimed to have been performed for or materials claimed to have been
676  furnished to Tenant or the Premises, and, in case of any such lien attaching or notice of any lien,
677  Tenant covenants and agrees to cause it to be immediately released and removed of record.
678  Notwithstanding anything to the contrary set forth in this Lease, in the event that such lien is not
679  released and removed on or before the date occurring five (5) days after notice of such lien is
680  delivered by Landlord to Tenant, Landlord, at its sole option, may immediately take all action
681  necessary to release and remove such lien, without any duty to investigate the validity thereof,
682  and all sums, costs and expenses, including reasonable attorneys' fees and costs, incurred by

683    Landlord in connection with such lien shall be deemed Additional Rent under this Lease and
684    shall immediately be due and payable by Tenant.

685                                    ARTICLE 10
686
687                                    INSURANCE

688        10.1. Indemnification and Waiver. To the extent not prohibited by law, Landlord, its
689    partners, trustees, ancillary trustees and their respective officers, directors, shareholders,
690    beneficiaries, agents, servants, employees, and independent contractors (collectively, the
691    "Landlord Parties") shall not be liable for any damage either to person or property or resulting
692    from the loss of use thereof, which damage is sustained by Tenant or by other persons claiming
693    through Tenant. Tenant shall indemnify, defend, protect, and hold harmless Landlord Parties
694    from any and all loss, cost, damage, expense and liability (including, without limitation, court
695    costs and reasonable attorneys' fees) incurred in connection with or arising from any cause in, on
696    or about the Premises or any acts, omissions or negligence of Tenant or the Tenant Parties, in, on
697    or about the Real Property, either prior to, during, or after the expiration of the Lease Term,
698    provided that the terms of the foregoing indemnity shall not apply to the negligence or willful
699    misconduct of Landlord or the Landlord Parties. Should Landlord be named as a defendant in
700    any suit brought against Tenant in connection with or arising out of an event covered by the
701    foregoing indemnity, Tenant shall pay to Landlord its costs and expenses incurred in such suit,
702    including, without limitation, its actual professional fees such as appraisers', accountants' and
703    attorneys' fees. Landlord shall indemnify, defend, protect, and hold harmless Tenant and the
704    Tenant Parties from any and all loss, cost, damage, expense and liability (including, without
705    limitation, court costs and reasonable attorneys' fees) incurred in connection with or arising from
706    any cause in, on or about the Real Property, either prior to, during, or after the expiration of the
707    Lease Term, except to the extent caused by the negligence or willful misconduct of the Tenant or
708    the Tenant Parties. Should Tenant be named as a defendant in any suit brought against Landlord
709    in connection with or arising out of an event covered by the foregoing indemnity, Landlord shall
710    pay to Tenant its costs and expenses incurred in such suit, including, without limitation, its actual
711    professional fees such as appraisers', accountants' and attorneys' fees. Notwithstanding
712    anything to the contrary set forth in this Lease, either party's agreement to indemnify the other
713    party as set forth in this Section 10.1, above, shall be ineffective to the extent the matters for
714    which such party agreed to indemnify the other party are covered by insurance carried by such
715    party or, if not carried, would have been covered by insurance required to be carried by such
716    party pursuant to this Lease. Further, Tenant's agreement to indemnify Landlord and Landlord's
717    agreement to indemnify Tenant pursuant to this Section 10.1 are not intended and shall not
718    relieve any insurance carrier of its obligations under policies required to be carried by Tenant or
719    Landlord pursuant to the provision of this Lease, to the extent such policies cover the matters
720    subject to the parties' respective indemnification obligations; nor shall they supersede any
721    inconsistent agreement of the parties set forth in any other provision of this Lease. The
722    provisions of this Section 10.1 shall survive the expiration or sooner termination of this Lease
723    with respect to any claims or liability occurring prior to such expiration or termination.

724        10.2. Tenant's Compliance with Landlord's Fire and Casualty Insurance. The coverage
725    and amounts of insurance carried by Landlord in connection with the Building shall at a
726    minimum be comparable to the coverage and amounts of insurance which are carried by

LOSA2\329548.2

727   reasonably prudent landlords of Comparable Buildings.  Upon inquiry by Tenant, from time to
728   time, Landlord shall inform Tenant of such coverage carried by Landlord.  Tenant shall, at
729   Tenant's expense, comply with all insurance company requirements pertaining to the use of the
730   Premises. If Tenant's conduct or use of the Premises causes any increase in the premium for any
731   insurance policies carried by Landlord, then Tenant shall reimburse Landlord for any such
732   increase.  Tenant, at Tenant's expense, shall comply with all rules, orders, regulations or
733   requirements of the American Insurance Association (formerly the National Board of Fire
734   Underwriters) and with any similar body.

735       10.3.  <u>Tenant's Insurance</u>.    Tenant shall maintain the following coverages in the
736   following amounts:

737       10.3.1. Commercial General Liability Insurance covering the insured against
738   claims of bodily injury, personal injury and property damage arising out of Tenant's operations,
739   assumed liabilities or use of the Premises, including a Commercial General Liability
740   endorsement covering the insuring provisions of this Lease and the performance by Tenant of the
741   indemnity agreements set forth in <u>Section 10.1</u> of this Lease, for limits of liability not less than:
742   (i) Bodily Injury and Property Damage Liability - $2,000,000 each occurrence and $2,000,000
743   annual aggregate, and (ii) Personal Injury Liability - $2,000,000 each occurrence and $2,000,000
744   annual aggregate.  Tenant shall also maintain umbrella excess liability insurance on a following
745   form basis in excess of the required commercial general liability insurance with limits not less
746   than $5,000,000 per occurrence and aggregate.

747       10.3.2. Physical Damage Insurance covering (i) all office furniture, trade fixtures,
748   office equipment, merchandise and all other items of Tenant's property on the Premises installed
749   by, for, or at the expense of Tenant, (ii) the **"Tenant Improvements,"** as that term is defined
750   herein, and (iii) all other improvements, alterations and additions to the Premises.  Such
751   insurance shall be written on an "all risks" of physical loss or damage basis, for the full
752   replacement cost value new without deduction for depreciation of the covered items and in
753   amounts that meet any co-insurance clauses of the policies of insurance and shall include a
754   vandalism and malicious mischief endorsement, sprinkler leakage coverage and earthquake
755   sprinkler leakage coverage.

756       10.3.3. Loss-of-income and extra-expense insurance in such amounts as will
757   reimburse Tenant for direct or indirect loss of earnings attributable to all perils commonly
758   insured against by prudent tenants or attributable to prevention of access to the Premises or to the
759   Building as a result of such perils.

760       10.3.4. Worker's Compensation and Employer's Liability or other similar
761   insurance, on an "occurrence" basis with a limit of not less than $2,000,000 per occurrence,
762   pursuant to all applicable state and local statutes and regulations.

763       10.3.5. Commercial Automobile Liability Insurance on an "occurrence" basis,
764   with a combined single limit of not less than $2,000,000 per occurrence covering bodily injury
765   and property damage liability arising out of the use by or on behalf of Tenant, its agents and
766   employees of any Tenant owned, non-owned (i.e., leased or rented) or hired motor vehicle or
767   automotive equipment.  Such commercial automobile liability insurance shall include contractual

- 17 -